Kelly, J.
I disagree with the majority’s conclusions (1) that a medical malpractice plaintiff must always allege the negligence of a specific individual in an action for vicarious liability and that jury instructions must reflect such allegations, and (2) that muses are not subject to the standard of care for medical malpractice defendants as defined by the Legislature in MCL 600.2912a. I would hold that, in such cases, vicarious liability can be premised on proof that an unidentified member or members of a discrete unit in a hospital were professionally negligent.
I would hold also that the trial court did not err when it applied a national standard of care to this case. Moreover, nurses practicing advanced care that requires special training are specialists within the meaning of MCL 600.2912a and therefore are subject to a national standard of care. Thus, I would affirm *36 the Court of Appeals decision to uphold the jury verdict.
I. factual and procedural history
Plaintiffs’ son Brandon was bom at defendant Hurley Medical Center extremely premature and underweight. Immediately after birth, Brandon was placed in level three neonatal intensive care. That neonatal intensive care unit (nicu) is reserved for the most seriously ill newborn patients. In the nicu, a doctor inserted an umbilical arterial catheter (uac) into Brandon’s abdomen to monitor his blood gas levels. The uac was secured to Brandon with tape and sutures. Later, the uac was adjusted by the nicu nurses and retaped.
Two days after Brandon’s birth, Nurse Martha Plamondon drew blood from the uac to test Brandon’s blood gases and repositioned the baby. Twenty minutes later, at 4:20 P.M., a respiratory therapist discovered that Brandon was bleeding. Brandon’s uac had become dislodged and he was suffering the effects of blood loss. He had lost approximately 40cc of blood, or about half of his total blood volume. By at least one account, Brandon had likely been bleeding the entire twenty minutes. However, no alarm had sounded.
The events that followed are in dispute. Nurse Plamondon testified that she applied pressure to stop the bleeding and administered a 20cc push of Plasmanate at the order of Dr. Robert Villegas. Dr. Ville-gas did not recall giving such an order. Although the hospital’s procedures require that the physician who orders treatment be noted on a patient’s chart, no doctor’s name appears on Brandon’s chart authorizing *37 the 20cc push of Plasmanate. The 20cc push is recorded at 4:40 P.M., twenty minutes after Brandon was discovered bleeding. Dr. Villegas testified that he would have ordered two separate pushes of lOcc of Plasmanate had he done anything at all.
A resident doctor, Dr. Amy Sheeder, arrived in answer to a page from Nurse Plamondon. Dr. Sheeder ordered another push of lOcc of Plasmanate, as well as 20cc of packed blood cells. Brandon was also given additional oxygen through an increase in his respirator rate and “bagging.” The following day, he was transferred to Children’s Hospital, where an ultrasound revealed that he had suffered intercraniai bleeding, and he was diagnosed as having cerebral palsy. Brandon has ongoing mental and physical disabilities.
Plaintiffs filed a medical malpractice claim against defendant and one of its doctors, Dr. Edilberto Moreno. Dr. Moreno was dismissed by stipulation before trial, leaving no member of defendant’s hospital staff named as a defendant. Plaintiffs alleged that the defendant medical center was vicariously liable for the active and passive negligence of the nicu staff (1) in allowing the uac to become dislodged, and (2) in failing to respond properly once the uac became dislodged. They claimed that the resulting blood loss and treatment caused Brandon’s mental and physical disabilities.
Plaintiffs were awarded $475,000 in mediation. They accepted the award, but defendant rejected it. At trial, defendant challenged plaintiffs’ expert witnesses, Dr. Houchang Modanlou and Dr. Carolyn Crawford. Each testified about the standard of care in an Nicu and each concluded that defendant’s nicu staff breached the standard of care. Defendant argued that *38 the doctors were unfamiliar with the standard of care in the locality. The trial judge rejected defendant’s argument that a local standard of care applied to the case.
Both plaintiffs’ expert doctors were permitted to testify that members of defendant’s nicu breached the standard of care in their treatment of Brandon. Their testimony established, also, that nicu staff negligence caused Brandon’s injuries. As the trial progressed, at times plaintiffs focused on the negligence of Nurse Plamondon and at other times advanced a broader theory of liability against the entire nicu.
By closing argument, plaintiffs settled on the broader theory that substandard basic care in the nicu caused Brandon’s injuries. Although plaintiffs named Nurse Plamondon in the closing argument, they left it to the jury to determine whether anyone in the nicu committed malpractice. At the very least, these were alternate theories of defendant’s liability. Defendant offered expert testimony supporting a contrary view, arguing that Brandon, bom at just twenty-six or twenty-seven weeks gestation and 900 grams, was likely to have mental and physical disabilities without an intervening cause.
Defendant requested jury instmctions confining the negligence issue to an evaluation of a neonatal nurse practitioner in the same or similar circumstances. Defendant argued that plaintiffs’ case was confined to allegations about Nurse Plamondon. The trial court rejected the argument, concluding that plaintiffs’ case was not limited to Nurse Plamondon. On its own initiative and over defendant’s objection, the trial judge modified the standard jury instmctions. SJI2d 30.01. He instructed the jury that it should consider whether the nicu failed to do what an nicu would do under the *39 samé or similar circumstances. The jury found in plaintiffs’ favor and awarded $2,400,000.
Defendant moved for judgment notwithstanding the verdict, a new trial, or remittitur. The trial judge granted remittitur, ordering a new trial unless plaintiffs accepted the $475,000 awarded at mediation. Plaintiffs appealed to the Court of Appeals, which remanded the case to the trial court for a detailed opinion supporting the remittitur amount.[1] On remand, a different judge reversed the remittitur and granted JNOV for defendant. Plaintiffs appealed again, and the Court of Appeals reversed and reinstated the jury verdict, which the panel found was supported by sufficient evidence.[2] The panel refused to reach issues raised by defendant because it had not properly filed its cross appeal.
Rather than appeal from that decision, defendant returned to the trial court where, over plaintiffs’ objection, the judge entered a new order on the jury verdict. When defendant sought review of that order, the Court of Appeals affirmed the original judgment on procedural grounds. It held in a split decisión that the trial court lacked the authority to issue a new order and that the law of the case barred defendant’s appeal.[3]
Defendant sought leave to appeal here and, in a split decision, this Court vacated the most recent Court of Appeals decision and remanded for consideration of defendant’s arguments.[4] On remand, the *40 Court of Appeals resolved the issues against defendant and again upheld the jury verdict in a split decision.[5] Defendant again filed an application for leave to appeal to this Court. After initially denying leave, a majority of this Court granted defendant’s motion for reconsideration and granted leave to appeal. 465 Mich 946 (2002).
H. JURY INSTRUCTION
We review claims of instructional error de novo. Case v Consumers Power Co, 463 Mich 1, 6; 615 NW2d 17 (2000). However, to the extent that the review requires an inquiry into the facts, we review the trial court’s decision on underlying factual issues for an abuse of discretion. See Hilgendorf v St John Hosp & Medical Ctr, 245 Mich App 670, 694-695; 630 NW2d 356 (2001); Isagholian v Transamerica Ins Corp, 208 Mich App 9, 16; 527 NW2d 13 (1994).
The trial court did not abuse its discretion in this case when it rejected defendant’s argument that plaintiffs’ case was confined to allegations of Nurse Plamondon’s negligence. It was correct to modify the standard jury instructions to reflect plaintiffs’ theory of the case, rather than deliver defendant’s requested instructions focusing on Nurse Plamondon.[6]
*41 A trial court is permitted, in fact required, to modify the standard jury instructions to fit the facts of a particular case. See Case, supra at 6; see also Tobin v Providence Hosp, 244 Mich App 626, 672-673; 624 NW2d 548 (2001). This case is unusual in that every member of the nicu is a specialist, subject to a national standard of care. See part m. Moreover, plaintiffs did not allege a highly technical failure that could be a breach of the standard of care for one member of the nicu and not another.
The evidence here was that, in an nicu, a uac should not become dislodged. A baby should not bleed for twenty minutes. And a baby of Brandon’s size should not be given a single push of 20cc of Plasmanate, let alone a total volume of 50cc Plasmanate and blood within one hour and twenty minutes. Moreover, there was evidence that Brandon’s respirator was set too high, causing his lungs to rupture and contributing to a diminished oxygen supply. Regardless of whether it was a nurse or doctor responsible for these errors, there was evidence of a breach of the general standard of care appropriate for a level three nicu.
In many if not the majority of medical malpractice cases, the instructions modeled after SJI2d 30.01 must specify the individual medical professionals alleged negligent and articulate a standard of care for each professional. However, the negligence alleged in this case mingles the culpability of several members of defendant’s Nicu staff. Plaintiffs were not able to determine which member of the staff was responsible for certain actions because the hospital records were incomplete and the nicu staff members implicated one another.
*42 Considering all the circumstances, it was permissible to instruct the jury regarding the negligence of the discrete hospital unit. The trial court did not err when it instructed the jury:
When I use the words professional negligence or malpractice with respect to the Defendant’s conduct, I mean the failure to do something which a hospital neonatal intensive care unit would do or the doing of something which a hospital neonatal intensive care unit would not do under the same or similar circumstances you find to exist in this case.
It is for you to decide, based upon the evidence, what the hospital neonatal intensive care unit with the learning, judgment or skill of its people would do or would not do under the same or similar circumstances. . . [7]
To establish medical malpractice, a plaintiff must prove: “(1) the applicable standard of care, (2) breach of that standard by defendant, (3) injury, and (4) proximate causation between the alleged breach and the injury.” Wischmeyer v Schanz, 449 Mich 469, 484; 536 NW2d 760 (1995). To establish vicarious liability against a hospital, a plaintiff must show that an agent of the hospital committed malpractice. The principal *43 is held to have done what the agent did. Smith v Webster, 23 Mich 298, 299-300 (1871); see also Ducre v Sparrow-Kroll Lumber Co, 168 Mich 49, 52; 133 NW 938 (1911).
As is true in any malpractice claim, the individual or individuals alleged to be negligent must have breached the standard of care within the course of the physician-patient relationship. See Dorris v Detroit Osteopathic Hosp Corp, 460 Mich 26, 45; 594 NW2d 455 (1999); Bronson v Sisters of Mercy Health Corp, 175 Mich App 647, 652; 438 NW2d 276 (1989).
The majority adopts defendant’s position that a plaintiff has not proven a case of medical malpractice vicarious liability until the plaintiff has (1) identified the specific individual professional or professionals who breached the standard of care and (2) proven that the individual breached the applicable standard of care. It asserts that the unit instructions in this case improperly limited the burden of proof for plaintiffs.
However, neither defendant nor the majority identifies any authority for the proposition that a medical malpractice plaintiff must always allege the negligence of a specifically named individual. This is because there is no such authority. Whether unit liability instructions, such as were given in this case, are ever permissible is an issue of first impression.[8]
*44 Where a plaintiff alleges the discrete negligent act of a hospital’s agent, the jury must be instructed on that individual’s obligation to meet a specific standard of care. Here, plaintiffs alleged that the nicu staff failed to properly maintain a uac as a level three Nicu should.
Where no unit member can be shown negligent, but negligence is established, plaintiffs need not prove which one breached the generally applicable standard of care to find the principal vicariously liable. In this unusual case, plaintiffs shouldered and satisfied the burden of proving malpractice supporting their vicarious liability claim using the unit theory.
A medical malpractice plaintiff must prove (1) duty, though a physician-patient relationship, (2) breach of duty, through a breach of the standard of care, (3) proximate causation, and (4) harm. A plaintiff does not escape this burden when, as in this case, the jury is instructed concerning the liability of a discrete hospital unit.
Here, evidence was presented that supported the jury’s conclusion that (1) every member of the Nicu had a physician-patient relationship with Brandon, and therefore a duty to meet the standard of care, (2) the care Brandon received in the Nicu was substandard, under the established standard for basic care given in an NICU, (3) the breach of care caused prolonged oxygen deprivation and an intercranial bleed, and (4) the oxygen deprivation and bleeding permanently harmed Brandon. Under the circumstances of this case, the unit theory of liability did not relieve plaintiff of any burden whatsoever.
The rule of law adopted by the majority actually increases a plaintiff’s burden in vicarious liability *45 medical malpractice cases. In this case, evidence supports the jury’s conclusion that the patient’s care was mishandled by a discrete hospital unit. It shows that an agent of the hospital committed malpractice, either alone or as part of a system’s mismanagement. In such a case, it should not be necessary for the plaintiff to prove which individual is culpable. A rule requiring such a showing allows hospitals to benefit from their employees’ fingerpointing and poor record keeping.
The dissenting Court of Appeals judge believed that, because a hospital must render treatment through its physicians and nurses, a plaintiff must specifically identify the individuals who are negligent, citing Danner v Holy Cross Hosp, 189 Mich App 397, 398-399; 474 NW2d 124 (1991). I do not dispute that it is the doctors and nurses in the nicu that are alleged to be negligent in this case. However, to conclude that, because there is no specifically named individual, there is no physician-patient relationship to support plaintiffs’ claim against defendant is fatuous.
In this case, every member of defendant’s NICU had a provider-patient relationship with Brandon. Thus, no matter which individual was named, that requirement would be satisfied. It would have been satisfied if plaintiffs and the trial court had listed each member of the Nicu and it was satisfied by referring to those individuals collectively as “the hospital neonatal intensive care unit.”[9]
*46 My view is consistent with the Court of Appeals holding in Tobin, supra. There, the panel held that SJI2d 30.01 must be modified to fit the facts of the case at hand. It concluded that the trial court erred when it delivered the following generalized instructions:
When I use the words “professional negligence” or “malpractice” with respect to the defendant’s conduct, I mean the failure to do something which a hospital’s agents/ servants/employees of ordinary learning, judgment or skill in this community or a similar one would do, or the doing of something which a hospital’s agents/servants/employees of ordinary learning, judgment or skill would not do, under the same or similar circumstances you find to exist in this case.
It is for you to decide, based upon the evidence, what the ordinary hospital’s agents/servants/employees or [sic, of] ordinary learning, judgment or skill would do or would not do under the same or similar circumstances. [Id. at 672.]
Tobin correctly determined that the standard instructions were too nonspecific to allow the jury to determine whether any of the defendant’s employees breached the standard of care. Id. at 673. As in this case, the alleged malpractice in Tobin was limited to the vicarious liability of a hospital defendant. However, in sharp contrast to the case at hand, the allegations of medical negligence in Tobin were complex. *47 Also, each of the individuals alleged to be negligent was subject to a different standard of care. The plaintiff in Tobin essentially alleged that a nurse anaesthetist, medical technician, emergency room surgeon, and critical care physician, or a combination of them, breached the applicable standards of care. See id. at 660. She claimed that those breaches caused her husband to receive an unauthorized blood transfusion and that the blood was contaminated with bacteria, causing her husband’s death. Id. at 631.
Whereas the instructions modeled after SJI2d 30.01 needed to be specific in Tobin, they were more appropriately general in this case. A trial court must consider the facts of every case and deliver instructions that best convey the applicable legal theories to the jury. Accordingly, I would endorse the Court of Appeals clear directive to trial courts in Tobin: “[I]nstruct the jury using a modification of SJI2d 30.01 that accurately delineates the standards of care applicable to the various medical personnel who plaintiff contends committed malpractice . ...” Id. at 675.
This is not a case of res ipsa loquitur, even as that doctrine has been loosely construed in Michigan.[10] In a medical malpractice case, a plaintiff may present expert testimony that, but for a breach of the standard of care, the result in the case would not have *48 occurred. This is sufficient evidence of the breach to go to a jury. See Jones v Poretta, 428 Mich 132, 154-155; 405 NW2d 863 (1987). Res ipsa loquitur refers to circumstantial evidence of negligence where the specific incidence of negligence cannot be identified. Id. at 150, citing Mitcham v Detroit, 355 Mich 182, 186; 94 NW2d 388 (1959). Here, the incidents of negligence were identified, but the specific actor was not.
This is a stronger case for liability than the ordinary claim of res ipsa loquitur. It is not necessary to speculate that someone must have been negligent on the basis that there is direct evidence of negligence. This case does not rely on expert testimony that, but for someone’s negligence, Brandon would not be impaired, a conclusion unsupported by the evidence. Here, there was expert testimony that a uac would not become and remain dislodged for twenty minutes in a level three Nicu if the staff had complied with the standard of care. That was direct evidence that the staff breached that standard.
Moreover, this is not a case of the discrete negligence of an individual caregiver. Rather, what the evidence established was a systemic failure of the Nicu. Several errors were made relating to the maintenance of the UAC. First, there was evidence that the uac should not have become dislodged. This could have happened because it was improperly inserted by one of the physicians or it could have happened because Nurse Plamondon dislodged it when she checked Brandon.
Second, once the uac became dislodged, there was evidence that someone in the nicu should have noticed sooner that Brandon was in distress. Both Nurse Plamondon and Dr. Villegas were present. Third, there was evidence that either Nurse *49 Plamondon or both she and Dr. Sheeder gave Brandon too great a volume of Plasmanate and red blood cells within too short a time.
Finally, there was evidence that Brandon’s respirator was set too high in response to his blood loss, causing ruptured alveoli in his lungs and contributing to his depleted oxygen level. This, like the administering of Plasmanate, was a medical decision that should not have been made by Nurse Plamondon.
The evidence does not reveal with certainty which member of the nicu staff was responsible for each of these failures. It does establish that the members of the Nicu as a group breached the standard of care for an nicu. Had the jury been instructed on the negligence of Nurse Plamondon, Dr. Villegas, or Dr. Sheeder, individually, it might not have been able to identify which was negligent. Evidence of who was responsible for the negligent acts was much more readily accessible to defendant than to plaintiffs. For that reason and because this is a case of vicarious liability, plaintiffs did not need to specify which members of the Nicu staff breached the general standard of care.
The unit negligence instruction does not relieve plaintiffs of their burden of proof under the circumstances of this case. On the contrary, the majority’s blanket rule oversimplifies the case and increases the burden on plaintiffs. Although the majority’s holding would be sound if the responsible individual or individuals could be identified, in this case it was not possible. The hospital staff failed to record who took what action. The effect of the holding, rather than reduce plaintiff’s burden, is to insulate the malpractice defendants from vicarious liability.
*50 There was evidence here of substandard care given by a hospital unit. The trial court’s modified instructions properly conveyed a legitimate legal theory to the jury without risk of added confusion. It was correct.
ID. STANDARD OF CARE
Defendant argues that because (1) the only negligence alleged in this case was that of Nurse Plamondon, and (2) all nurses are subject to a local standard of care, the trial court erred when it concluded that a national standard of care applied in this case. As the majority notes, the Court of Appeals did not address this issue. Instead, it focused on whether the trial court abused its discretion when it admitted Dr. Modanlou’s expert testimony concerning the national standard of care. This is understandable, as defendant has consistently fused two distinct issues. Even in its brief before this Court, defendant asserts the standard of review for an evidentiary error. It does not identify what standard of care applies to the alleged malpractice, a legal question. Hence, the majority reaches an issue that was never clearly argued or properly raised.
Whether all nurses are subject to a local standard of care is a legal question that requires statutory interpretation, which this Court reviews de novo. See Cardinal Mooney High School v Michigan High School Athletic Ass’n, 437 Mich 75, 80; 467 NW2d 21 (1991). It is an issue of first impression.
Defendant relies on cases that do not reach whether nurses can ever be considered specialists. I would reject its argument for two additional reasons: First, the trial court correctly determined that plain *51 tiffs alleged the negligence of more people than just Nurse Plamondon. Because I believe it was permissible to allege the negligence of the nicu, the standard of care here should be that applicable to the Nicu as a whole, a national standard of care. See part n.
This is not to be confused with the standard of care for an nicu physician, a neonatologist, or an nicu nurse. In a medical malpractice case where a plaintiff alleges a more technical breach, the more specific standard of care for the individual alleged to have been negligent must be applied. In this case, only the standard of basic care was at issue.
Second, even if Nurse Plamondon were the only individual alleged to be negligent, a nurse who is specially trained to give advanced care is a specialist under MCL 600.2912a, subject to a national standard of care. Therefore, I disagree with the “guidance” the majority offers to the trial court. Here, every member of the nicu staff, both doctors and nurses, had been specially trained to care for critically ill newborn infants. Therefore, every individual and the unit as a whole were subject to the national standard of care for maintaining a uac in a level three nicu.
It has been established that healthcare providers are subject either to a national or a local standard of care. In 1975, faced with the argument that the locality rule should be abandoned for a more national standard,[11] the Legislature codified the two different standards of care for medical malpractice defendants. MCL 600.2912a. The local standard was designated for *52 the “general practitioner” and the national for the “specialist.” It falls to this Court to determine which medical caregivers fit into the category of “general practitioner” and which are “specialists.” On the basis of the Legislature’s directive in MCL 600.2912a, I would conclude that a nurse may be either, depending on the level of training and expertise the job requires.
MCL 600.2912a(l) provides, in relevant part:
[I]n an action alleging malpractice, the plaintiff has the burden of proving that in light of the state of the art existing at the time of the alleged malpractice:
(a) The defendant, if a general practitioner, failed to provide the plaintiff the recognized standard of acceptable professional practice or care in the community in which the defendant practices or in a similar community, and that as a proximate result of the defendant failing to provide that standard, the plaintiff suffered an iryury.
(b) The defendant, if a specialist, failed to provide the recognized standard of practice or care within that specialty as reasonably applied in light of the facilities available in the community or other facilities reasonably available under the circumstances, and as a proximate result of the defendant failing to provide that standard, the plaintiff suffered an injury.
Therefore, general practitioners usually are subject to a local standard of care and specialists are held to a national standard. The language of MCL 600.2912a quite clearly does not distinguish between physicians and nurses when it classifies “the defendant” in a medical malpractice case as a specialist or general practitioner. There is no reason to depart from the statute and treat physicians and nurses differently, where the relevant issue is the level of the defendant’s training and knowledge.
*53 The majority, in an analysis that has the appearance of being outcome determined, departs from the Legislature’s directive when it concludes that MCL 600.2912a does not apply to nurses. It claims to rely on the plain language of MCL 600.2912a in concluding that the specialist-general practitioner dichotomy does not apply to nurses.[12] However, after disregarding the obvious scope of MCL 600.2912a, the majority bases its conclusion solely on the definitions of “general practitioner,” “specialist,” “practitioner,” “medical practitioner,” “licensed health care professional,” “registered professional nurse,” “physician,” and “practice of medicine.” In so doing, it looks far afield of the statute, which plainly and unambiguously applies to every defendant in a medical malpractice action.
Next, given that all medical malpractice defendants are subject to MCL 600.2912a, one must determine whether a nurse may ever be considered a specialist for the purposes of the statute. A specialist is “a person devoted to one subject or to one particular branch of a subject or pursuit,” or “a medical practitioner who deals only with a particular class of diseases, conditions, patients, etc.” Random House Webster’s College Dictionary (1997).
It is well established that one engaging in the prenatal care of an infant is generally considered a specialist, subject to a national standard of care. See, e.g., Thomas v McPherson Community Health Ctr, 155 Mich App 700, 708; 400 NW2d 629 (1986); Swanek v Hutzel Hosp, 115 Mich App 254, 257; 320 NW2d 234 (1982); McCullough v Hutzel Hosp, 88 Mich App 235, *54 241; 276 NW2d 569 (1979). However, a specialist is classified as such by virtue of advanced training, not merely by having concentrated in a specific area of practice. See Jalaba v Borovoy, 206 Mich App 17, 21-22; 520 NW2d 349 (1994); Dunn v Nundkumar, 186 Mich App 51, 53; 463 NW2d 435 (1990).
Applying the facts of this case to that law, a nurse can specialize in an area of care that requires advanced training particular to a type of practice. For example, Nurse Plamondon specialized in neonatal intensive care. She received intensive training before she could work in the nicu. There was evidence that she was able to perform procedures necessary for the needs of an infant in the level three nicu, for which even the resident doctor was untrained. All staff members specially trained to care for patients in a specialized hospital unit, including nurses, must be subject to a national standard of care for their individual roles. Thus, if the only issue were Nurse Plamondon’s negligence, the national standard of care would apply to this case.
Even if the majority were correct that MCL 600.2912a applies only to physicians, a local standard of care should not apply. Plaintiffs alleged that the Nicu as a unit failed to give Brandon the care he should have received there. The evidence supported plaintiffs’ theory that Brandon’s uac should not have been dislodged long enough to spill half his blood volume, and the Nicu should not have responded as it did. Where the care given in a unit is specialized, all of it should be measured against the national standard for the basic care offered to patients in such a unit.
It is apparent to me that defendant is employing smoke and mirrors when asking for a new trial *55 because a national rather than a local standard of care was applied. Defendant never articulated, either before the trial court or here, how the two standards are different. Upon examination, it is apparent that the local and national standards for a practitioner in an NICU are one and the same. If, on remand, the trial court were to conclude that plaintiffs advanced a claim against only Nurse Plamondon, her care of Brandon would be measured by the same standard applied earlier. Merely the name, “local standard of care,” would be changed.
IV. CONCLUSION
I would affirm the Court of Appeals decision to uphold the jury verdict against defendant. On the particular facts of this case, I cannot conclude that it was error to instruct the jury regarding the negligence of the hospital unit. The instructions properly conveyed a valid legal theory of vicarious liability to the jury without additional risk of confusion. Moreover, the trial court was correct to apply a national standard of care to this case. Plaintiffs advanced a claim against more than just Nurse Plamondon.
Also, I would hold that nurses who (1) have received specialized training to give advanced care and (2) practice exclusively within an area of medicine recognized as a specialty are specialists within the meaning of MCL 600.2912a. Thus, even if plaintiffs’ medical malpractice claim were premised only on Nurse Plamondon’s actions, the care she gave Brandon should be weighed on a national standard.
Cavanagh, J., concurred with Kelly, J.

 Unpublished order, entered December 14, 1994 (Docket No. 179366).

 Unpublished opinion per curiam, issued November 22, 1996 (Docket No. 184859).

 Unpublished opinion per curiam, issued April 6, 1999 (Docket No. 205025).

 462 Mich 859 (2000).

 243 Mich App 72; 620 NW2d 859 (2000).

 In his dissenting and concurring opinion, Justice Markman discusses the trial court’s omission of the word “ordinary” from the jury instructions. Ante at 31-33. Consideration of the issue is inappropriate because defendant forfeited it. Defendant did not raise it until, six years after the jury verdict, the dissenting judge on the Court of Appeals panel identified the omission as grounds for reversal. See 243 Mich App 96-98. The issue had not been brought before that Court, was not raised in the trial court, and is only now argued by defendant for the first time.

7 I recognize that the instructions are a significant departure from the standard jury instructions, SJI2d 30.01, which, when unmodified, provide:
When I use the words “professional negligence” or “malpractice” with respect to the Defendant’s conduct, I mean the failure to do something which a [name profession] of ordinary learning, judgment or skill in [this community or a similar community/name particular specialty] would do, or the doing of something which a [name profession] of ordinary learning, judgment or skill would not do, under the same or similar circumstances you find to exist in this case.
It is for you to decide, based upon the evidence, what the ordinary [name profession] of ordinary learning, judgment or skill would do or not do under the same or similar circumstances.

 The majority criticizes my position as unsupported by authority. Ante at 12-13, n 12. However, it also offers no authority for the notion that ap individual agent of a hospital must be named and proven negligent in every case of vicarious liability. Tobin, supra, stands for the proposition that jury instructions must be modified to fit the facts of the case. It does not hold that they must always identify specific individuals and different standards of care.

 The majority tries to paint the nicu as only a physical thing, “a geographic location within the hospital,” rather than a discrete collection of defendant’s employees or agents. Ante at 12. While I would agree that a physical unit itself cannot form the basis of defendant’s vicarious liability, the term was an apt description of a group of individuals. It is the group that breached the standard of care in this case. It distorts reason to con *46 jecture that the jury understood “the hospital neonatal intensive care unit” to be a physical thing and not a descriptive term encompassing those employees of defendant responsible for Brandon’s care.
Moreover, defendant argued that Nurse Plamondon was the sole member of its staff that plaintiffs claimed to be negligent. The trial court was justified in rejecting that argument on the basis of evidence. I agree with the Court of Appeals that defendant should have requested more specific instructions naming the people within the nicu if it objected to identifying the wrongdoer as the unit. It did not do so.

 Michigan courts do not apply true res ipsa loquitur in medical malpractice cases. Strictly applied, res ipsa loquitur relieves a plaintiff of proving the exact negligent act that caused an injury, looking only to the result when the plaintiffs condition must have happened through some negligence. Jones v Poretta, 428 Mich 132, 150; 405 NW2d 863 (1987). See Prosser & Keeton, Torts (4th ed), § 39, p 222-224. In contrast, the Michigan rule requires that the plaintiff prove the breach of the standard of care, or “more than a bad result.” This is accomplished in a medical malpractice case with expert testimony that the result would not have happened had the plaintiff been treated in accordance with the standard of care. Jones, supra 151-156.

 In his concurring opinion in Siirila v Barrios, 398 Mich 576, 625-630; 248 NW2d 171 (1976), Justice Williams argued for abandonment of the locality rule in favor of a national standard of care for all medical caregivers. He urged local practice as but one consideration in evaluating the standard of care.

 Ante at 18.