# STATE OF MICHIGAN

# COURT OF APPEALS

ESTATE OF HARISHKUMAR PATEL, by
HEMUBEN PATEL, Personal Representative,

        Plaintiff-Appellee/Cross-Appellant,

v

REINALT-THOMAS CORPORATION, d/b/a
DISCOUNT TIRE COMPANY,

        Defendant,

and

GOODYEAR TIRE & RUBBER COMPANY,

        Defendant-Appellant/Cross-
        Appellee.

UNPUBLISHED
October 25, 2018

No. 337851
Berrien Circuit Court
LC No. 12-000336-NP

Before: SAWYER, P.J., and STEPHENS and GADOLA, JJ.

PER CURIAM.

Defendant, Goodyear Tire & Rubber Company (Goodyear), appeals as of right challenging the orders of the trial court denying Goodyear's motions for judgment notwithstanding the verdict (JNOV) and for new trial. On cross-appeal, plaintiff Estate of Harishkumar Patel, by Hemuben Patel, Personal Representative,[1] appeals as of right challenging the order of the trial court declining to set aside the non-economic damages cap. We affirm.

---

[1] On June 11, 2018, plaintiff's decedent, Harishkumar Patel, died. This Court thereafter granted plaintiff's motion to substitute Estate of Harishkumar Patel, by Hemuben Patel, Personal

-1-

## I.  FACTS

This is a product liability action involving a tire manufactured by Goodyear.  The parties do not dispute the underlying facts.  Plaintiff's decedent, Harishkumar Patel (Patel), was injured in a single-vehicle automobile accident on US 31 in Berrien County on July 6, 2012.  Patel was driving his 1998 Nissan Pathfinder when the right rear tire's tread separated (essentially, the belts of the tire coming apart at high speed), causing his truck to roll over.  Patel sustained spinal injuries that rendered him quadriplegic.  The tire in question was manufactured by Goodyear and was one of four tires sold new to Patel and installed on his vehicle by defendant Discount Tire Company (Discount Tire) on August 25, 2005.  At the time of the accident, the tire had been installed for almost seven years and had been driven approximately 45,000 miles.

Plaintiff brought this action against Goodyear and Discount Tire, alleging negligent production, gross negligence, and breach of implied warranty.  The trial court thereafter granted summary disposition to Discount Tire, dismissing it from the case.  Plaintiff proceeded to trial against Goodyear, which ended in a mistrial when the jury became deadlocked.

The case was retried, and at the close of proofs in the second trial the case was submitted to the jury on the counts of negligent production and breach of implied warranty.  This time, the jury found for plaintiff on both counts.  The jury was asked by special interrogatory whether Goodyear was grossly negligent, to which the jury answered "no."  The jury awarded plaintiff the amount of $16,115,048, including $8,750,000 for non-economic damages.

The trial court thereafter denied Goodyear's motions for JNOV and for new trial.  The trial court also denied plaintiff's motion to set aside the non-economic damages cap and reduced the award of $8,750,000 for non-economic damages to $794,500[2] in accordance with MCL 600.2946a(1).  Goodyear now appeals to this Court, and plaintiff cross-appeals.

## II.  ANALYSIS

### A.  MOTIONS FOR JNOV OR NEW TRIAL

Goodyear contends that it is entitled to JNOV or to a new trial because the trial court made a series of evidentiary errors that denied Goodyear a fair trial.  This Court reviews de novo a trial court's decision to grant or deny a motion for JNOV, *Hecht v Nat'l Heritage Academies, Inc*, 499 Mich 586, 604; 886 NW2d 135 (2016), while a trial court's decision to grant or deny a motion for new trial is reviewed for an abuse of discretion.  *Rental Props Owners Ass'n of Kent Co v Kent Co Treasurer*, 308 Mich App 498, 531; 866 NW2d 817 (2014).  In reviewing de novo a trial court's decision to grant or deny a motion for JNOV, this Court views the evidence, and

---

Representative, as plaintiff in this action.  *Patel v Reinalt-Thomas Corp*, unpublished order of the Court of Appeals, entered July 26, 2018 (Docket No. 337851).

[2] The parties stipulated to the application of the non-economic damages cap in effect for 2015. The amount of $794,500 is based upon plaintiff's calculation as represented to the trial court.

all legitimate inferences arising from the evidence, in a light most favorable to the nonmoving party. *Forge v Smith*, 458 Mich 198, 204; 580 NW2d 876 (1998).

## 1. GATEKEEPING FUNCTION

Goodyear first contends that the trial court abused its discretion by allowing plaintiff's expert, William Woehrle, to testify without properly applying the reliability factors of MCL 600.2955 to Woehrle's testimony. Goodyear argues that the trial court thereby failed to exercise its gatekeeping function and as a result, plaintiff's theories were improperly submitted to the jury without first being determined to be reliable. We disagree.

We note initially that plaintiff argues that this issue is not preserved for review by this Court. Before the first trial, Goodyear moved to exclude Woehrle's testimony, challenging the reliability and relevance of his testimony. The trial court denied Goodyear's motion and admitted the expert testimony. Before the second trial, the parties agreed to abide by the rulings made before the first trial. Woehrle thereafter testified as plaintiff's expert witness on the issues of tire design and manufacture, as well as causation. At the conclusion of the second trial, the jury entered a verdict for plaintiff, and Goodyear moved for JNOV and for new trial, renewing its challenge to the admissibility of Woehrle's testimony. The trial court denied both motions. This issue is therefore preserved for review by this Court. See *Elahham v Al-Jabban*, 319 Mich App 112, 119; 899 NW2d 768 (2017) (an issue is preserved if raised, addressed, and decided in the trial court). This Court reviews a trial court's decision to admit or exclude expert testimony for an abuse of discretion, see *Edry v Adelman*, 486 Mich 634, 639; 786 NW2d 567 (2010), while reviewing any preliminary legal questions regarding admissibility de novo. *People v Bass*, 317 Mich App 241, 255; 893 NW2d 140 (2016). A trial court's decision is not an abuse of discretion if it falls within the range of principled outcomes. *Edry*, 486 Mich at 639.

MRE 702 governs the admissibility of expert testimony and provides:

> If the court determines that scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Under MRE 702, the trial court is required to "ensure that each aspect of an expert witness's testimony, including the underlying data and methodology, is reliable," thereby incorporating "the standards of reliability that the United States Supreme Court articulated in *Daubert*[3]. . . ." *Elher v Misra*, 499 Mich 11, 22; 878 NW2d 790 (2016). Under the directive of *Daubert*, the trial court must ensure that all scientific testimony is both relevant and reliable. *Id.* at 22-23. Generally, it is not sufficient under MRE 702 to simply rely upon the expert's

---

[3] *Daubert v Merrell Dow Pharm, Inc*, 509 US 579; 113 S Ct 2786; 125 L Ed 2d 469 (1993).

background and experience to establish the reliability, and therefore the admissibility, of the expert's opinion. *Id*. at 23. "Not only must the plaintiff qualify his or her expert, he or she must also show that the actual expert testimony offered is based on the factual predicate knowledge required of the expert under MRE 703, which governs the bases of expert opinion testimony, and MCL 600.2955." *Gonzalez v St John Hosp & Med Center*, 275 Mich App 290, 305; 739 NW2d 392 (2007). "The overarching goal is 'to make certain that an expert . . . employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.' " *People v Kowalski*, 492 Mich 106, 120; 821 NW2d 14 (2012) (citation omitted).

In addition to MRE 702, MCL 600.2955 provides, in relevant part:

(1) In an action for the death of a person or for injury to a person or property, a scientific opinion rendered by an otherwise qualified expert is not admissible unless the court determines that the opinion is reliable and will assist the trier of fact. In making that determination, the court shall examine the opinion and the basis for the opinion, which basis includes the facts, technique, methodology, and reasoning relied on by the expert, and shall consider all of the following factors:

(a) Whether the opinion and its basis have been subjected to scientific testing and replication.

(b) Whether the opinion and its basis have been subjected to peer review publication.

(c) The existence and maintenance of generally accepted standards governing the application and interpretation of a methodology or technique and whether the opinion and its basis are consistent with those standards.

(d) The known or potential error rate of the opinion and its basis.

(e) The degree to which the opinion and its basis are generally accepted within the relevant expert community. As used in this subdivision, "relevant expert community" means individuals who are knowledgeable in the field of study and are gainfully employed applying that knowledge on the free market.

(f) Whether the basis for the opinion is reliable and whether experts in that field would rely on the same basis to reach the type of opinion being proffered.

(g) Whether the opinion or methodology is relied upon by experts outside of the context of litigation.

Our Supreme Court has specifically stated that "[c]onsistent with this [gatekeeper] role, the court 'shall' consider all of the factors listed in MCL 600.2955(1)." *Clerc v Chippewa Co War Memorial Hosp*, 477 Mich 1067, 1068; 729 NW2d 221 (2007). In its role as gatekeeper, the trial court may exercise its discretion, but "may neither 'abandon' this obligation nor 'perform the function inadequately.' " *Gilbert v DaimlerChrysler Corp*, 470 Mich 749, 780; 685 NW2d 391 (2004) (citation omitted). The trial court's gatekeeper role "mandates a searching inquiry,

-4-

not just of the data underlying expert testimony, but also of the manner in which the expert interprets and extrapolates from those data." *Id*. at 782. Our Supreme Court has acknowledged, however, that not all of the statutory factors will be relevant in every case. *Elher*, 499 Mich at 26.

In this case, the trial court issued a detailed, seven-page written opinion discussing Woehrle's proposed testimony at length. The trial court identified each section of Woehrle's anticipated testimony and stated the publications and opinions concurring with Woehrle. In doing so, the trial court essentially addressed factor (b) regarding whether the opinion and its basis have been subjected to peer review publication, factor (e), the degree to which the opinion and its basis are accepted within the relevant expert community, and also factor (f) regarding whether the basis for the opinion is reliable and whether experts in the field rely on that same basis. The trial court, however, did not specifically discuss each factor in its opinion. The trial court then stated:

> I have considered all of the factors listed in MCL 600.2955(1)(a)(g) but I have not relied on any one of these factors as being determinative. Rather, I have weighed them and have been flexible, as directed by Daubert, in molding them to this case. I have not relied on any novel methodology or form of scientific evidence. I conclude that Mr. Woehrle's testimony is based on sufficient facts and data and is the product of reliable principles and methods which Mr. Woehrle has applied reliably to the facts of this case. MRE 702.

We conclude that the trial court's ruling, while not explicit regarding every factor, was a sufficiently "searching inquiry" under MRE 702 and MCL 600.2955. When, as here, the trial court's detailed opinion reflects consideration of the relevant factors and states that the trial court has, in fact, considered all of the statutory factors, we conclude that the trial court was sufficiently searching in its inquiry into the reliability of the expert's testimony and did not abuse its discretion in allowing the expert to testify.

## 2. DESIGN DEFECT

Goodyear next contends that Woehrle's testimony regarding design defect was inadmissible because it was irrelevant. Goodyear argues that plaintiff failed to establish the requisite elements of a design defect, but Woehrle was nonetheless permitted to testify that the design of the tire could have been improved by adding a "nylon cap ply." We agree that the testimony regarding the nylon cap ply was irrelevant, but conclude that its admission does not warrant setting aside the jury's verdict.

In 1995, tort reform legislation was enacted that displaced application of common law principles in certain product liability actions in Michigan. *Curry v Meijer, Inc*, 286 Mich App 586, 591; 780 NW2d 603 (2009), citing *Greene v A P Products*, 475 Mich 502, 507-508; 717 NW2d 855 (2006). The tort reform legislation included 1995 PA 249, by which our Legislature amended the Revised Judicature Act (RJA), MCL 600.101 *et seq*. Under the amended RJA, a product liability action is defined as one "based on a legal or equitable theory of liability brought for the death of a person or for injury to a person or damage to property caused by or resulting from the production of a product." MCL 600.2945(h). "Production" is defined as "manufacture,

construction, design, formulation, development of standards, preparation, processing, assembly, inspection, testing, listing, certifying, warning, instructing, marketing, selling, advertising, packaging, or labeling." MCL 600.2945(i).

The amended RJA includes MCL 600.2946, which provides, in relevant part:

(2) In a product liability action brought against a manufacturer or seller for harm allegedly caused by a production defect, the manufacturer or seller is not liable unless the plaintiff establishes that the product was not reasonably safe at the time the specific unit of the product left the control of the manufacturer or seller and that, according to generally accepted production practices at the time the specific unit of the product left the control of the manufacturer or seller, a practical and technically reasonable alternative production practice was available that would have prevented the harm without significantly impairing the usefulness or desirability of the product to users and without creating equal or greater risk of harm to others. An alternative production practice is practical and feasible only if the technical, medical, or scientific knowledge relating to production of the product, at the time the specific unit of the product left the control of the manufacturer or seller, was developed, available, and capable of use in the production of the product and was economically feasible for use by the manufacturer. Technical, medical, or scientific knowledge is not economically reasonable for use by the manufacturer if use of that knowledge in production of the product would significantly compromise the product's usefulness or desirability.

A plaintiff alleging product liability may proceed under a theory of either negligence or warranty, but in either case must demonstrate that the defendant supplied a product that was defective and that the defect caused the plaintiff's injury. *MASB-SEG Prop/Cas Pool, Inc v Metalux*, 231 Mich App 393, 399; 586 NW2d 549 (1998). But although a plaintiff may allege negligence as part of a product liability action, negligence is actually a theory of liability, not a separate claim. See *Heaton v Benton Constr Co*, 286 Mich App 528, 534-535; 780 NW2d 618 (2009).

In this case, plaintiff's complaint alleged negligent production, asserting theories of both design defect and manufacturing defect. Plaintiff introduced at trial, through Woehrle's testimony, evidence that the tire had a number of manufacturing defects at the time that it left Goodyear's control, that those defects caused the tire's tread separation, and that the tread separation caused the accident. Woehrle testified that by looking at the tire, he could see that "trapped air" during the manufacturing process caused a defect known as a "blow" in the tire, and that the "blow" existed in the tire before it left the manufacturer. He also testified that there were several defects in the belt assembly of the tire, and one area where there was no adhesion between the rubber and the steel belt cables. He testified that he found "defects regarding how thin the inner liner was," which he testified is critical for belt durability, and he testified this condition is called "carcass cord shadows," and that this defect made the tire unsafe. He testified that the tread separation that caused the accident occurred at the area of the "blow," and that the centrifugal force of the tire turning at highway speeds caused the loose wires of the belts to cause the tread separation. He also testified that the tire had poor rubber to metal bonding, and that this

defect contributed to the tire's failure. He testified that Goodyear's policy is that if during the manufacturing process a tire has a "blow" or "carcass cord shadows," Goodyear's inspector is supposed to scrap the tire.

Woehrle further testified that the tire had "excess flash" (excess rubber that squeezes out through junctions in the mold) that should have been trimmed when the tire was inspected by Goodyear; he testified that the excess flash was not a cause of the tire's catastrophic failure in this case, but that the presence of the untrimmed excess flash indicated to Woehrle that the tire had not been inspected. He testified that the tire also had "irregular breakers" which in this tire was the presence of "off-center belts and poor splicing." He further testified that the tire had an irregular "step-off tread," which he described as the area where the wider inner belt and narrower outer belt meet, and which is supposed to be constant all around the tire to minimize strain on the belt edges, which he testified is the area where tires come apart. Woehrle also testified that the tire had "belt snaking" which leads to tread separations. The tire also had five "dog ears," being the place where the end of the belt is brought up to the beginning; to the extent that edges do not line up there is a "dog ear" and, according to Woehrle, the dog ears on this tire contributed to the failure of the tire.

Woehrle further testified that Goodyear could have prevented the defectively manufactured tire from leaving its control by having a better inspection system, namely, by permitting its inspectors sufficient time to inspect each tire. Plaintiff thereby established a prima facie case under MCL 600.2946(2) that (1) the tire was not reasonably safe at the time the specific unit of the product left Goodyear's control, and (2) a practical and technically feasible alternative production practice was available that would have prevented the harm without significantly impairing the tire's usefulness or desirability and without creating equal or greater risk of harm. Plaintiff therefore presented a prima facie case from which the jury could find Goodyear liable under the statute on the theory of manufacturing defect.

Woehrle also testified, however, that the tire's design should have included a "nylon cap ply," which he testified is an additional layer in the tire that would make any tire more durable. Woehrle conceded that he did not believe that the tire's design was defective, and further conceded that a nylon cap ply would not have prevented the tread separation, only that it would have made the tire safer in the event of a tread separation. Woehrle was nonetheless permitted to testify that the design of the tire could have been improved by adding a nylon cap ply. Goodyear argues that because plaintiff did not demonstrate that the tire had a defective design, testimony that the tire design could have been improved was irrelevant and inadmissible.

To be admissible, evidence introduced at trial must be relevant. MRE 402. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." MRE 401. However, "[a]n error in the admission or the exclusion of evidence . . . is not ground for . . . vacating, modifying, or otherwise disturbing a judgment or order, unless refusal to take this action appears to the court inconsistent with substantial justice," MCR 2.613(A), or affects a substantial right of an opposing party. *Craig v Oakwood Hosp*, 471 Mich 67, 76; 684 NW2d 296 (2004), citing MRE 103(a). In addition, a close evidentiary ruling ordinarily cannot be an abuse of discretion. *Barr v Farm Bureau Gen Ins Corp*, 292 Mich App 456, 458; 806 NW2d 531 (2011).

Here, Woehrle's testimony about the desirability of including the nylon cap ply in the design of the tire was irrelevant because plaintiff did not demonstrate a defect in the tire's design. Indeed, Woehrle testified not that the failure to include a nylon cap ply was a design defect, or that it would have prevented the tread separation, only that inclusion of a nylon cap ply would have made the tire safer in light of the litany of manufacturing defects he identified. In spite of this, there was ample evidence to support a finding of liability without the testimony regarding the nylon cap ply. Woehrle testified about numerous manufacturing defects in the tire and that those defects caused the tread separation that resulted in Patel's injuries. Woehrle also testified that had the tire been inspected, the manufacturing defects would have been apparent to any inspector and the tire would have been scrapped under Goodyear's own standards. In light of the substantial evidence of liability on the theory of manufacturing defect, we conclude that any error in the admission of testimony about the nylon cap ply was not sufficient ground for disturbing the jury's verdict. MCR 2.613(A).

### 3. VERDICT FORM

Goodyear also argues that the unproven design defect theory tainted the general verdict, making it impossible to know whether the verdict was rendered upon a valid or invalid theory. We disagree that the entire verdict has been rendered invalid.

A new trial is not necessarily warranted when one of several alternative theories of liability is found to have been improperly submitted to the jury; rather, a new trial is warranted only when "it is impossible to know if the jury rejected the other theories advanced by plaintiff and rendered judgment based on th[e] improperly submitted theory." *Tobin v Providence Hosp*, 244 Mich App 626, 645; 624 NW2d 548 (2001). A jury verdict is not destroyed where it is possible to conclusively establish that the verdict was based upon a properly submitted theory, and any error in a verdict is confined to its unsound portions. *Sudul v Hamtramck*, 221 Mich App 455, 458; 562 NW2d 478 (1997), citing *Sahr v Bierd*, 354 Mich 353, 365; 92 NW2d 467 (1958).

In this case, the jury was presented with multiple theories of liability, namely, (1) negligent production, encompassing theories of manufacturing defect and design defect, and (2) breach of implied warranty. On the verdict form, with respect to the claim of negligent production, the jury was asked "[w]as the defendant negligent?" and the jury responded "Yes." The verdict form also specifically asked the jury "[d]id the defendant breach an implied warranty?" and the jury responded "Yes." Goodyear now argues that it is not possible to know if the jury found it liable on the properly submitted theory of manufacturing defect or the improperly submitted theory of design defect, and that it is therefore entitled to a new trial.

We note initially that a party may not raise a challenge on appeal based on an error which the party deemed proper before the trial court. *Hoffenblum v Hoffenblum*, 308 Mich App 102, 117; 863 NW2d 352 (2014). And "[g]enerally, a party may not remain silent in the trial court, only to prevail on an issue that was not called to the trial court's attention." *Walters v Nadell*, 481 Mich 377, 387; 751 NW2d 431 (2008). However, if a party has not agreed but has simply failed to object, the party has not waived the issue but has instead forfeited the issue, which this Court may review as an unpreserved assertion of error. *People v Carter*, 462 Mich 206, 215; 612 NW2d 144 (2000). Here, Goodyear did not object to the verdict form combining the negligence

-8-

theories into a single question,[4] and thereby forfeited its challenge by failing to object to the verdict form at the trial court, and this issue is therefore unpreserved. See *id*.

This Court has the discretion to review an unpreserved claim of error, but is not obligated to do so. See *Waters*, 481 Mich at 387. This Court will review an unpreserved claim of error when the failure to do so would result in manifest injustice, when consideration is necessary to the proper determination of the case, or when the issue is a question of law and the facts necessary for resolution of the issue have been fully presented. *Smith v Foerster-Bolser Constr, Inc*, 269 Mich App 424, 427; 711 NW2d 421 (2006). Our Supreme Court has cautioned, however, that appellate courts should exercise their discretion to review unpreserved issues sparingly and only when exceptional circumstances dictate that review is warranted. *Napier v Jacobs*, 429 Mich 222, 233; 414 NW2d 862 (1987).

Here, we find it unnecessary to reach this unpreserved issue in light of the jury's verdict on the breach of implied warranty count. Plaintiff argues that even if Goodyear is correct in its challenge to the verdict on the negligence count, plaintiff nonetheless prevailed on the count for breach of implied warranty, and reversal is therefore unwarranted. We agree.

The theories of negligence and breach of implied warranty are separate causes of action with different elements, although in some factual contexts they involve the same elements and proofs. *Bouverette v Westinghouse Elec Corp*, 245 Mich App 391, 395; 628 NW2d 86 (2001), citing *Lagalo v Allied Corp*, 457 Mich 278, 287 n 11; 577 NW2d 462 (1998). And generally, "[a] plaintiff pursuing a claim of breach of implied warranty is not required to identify the precise defect in the product" or "whether the defect was caused by 'design, material, assembly or a combination. . . .'" *Kenkel v Stanley Works*, 256 Mich App 548, 557-558; 665 NW2d 490 (2003).

In *Lagalo*, our Supreme Court stated:

Since a defective product can reflect negligence in the design or manufacturing process, and can also give rise to a breach of implied warranty, the two theories of liability are often seen as closely related. However, we have noted on several occasions that these indeed are separate causes of action with different elements. *Smith v E R Squibb & Sons, Inc*, 405 Mich 79, 88-91; 273 NW2d 476 (1979); *Prentis v Yale Mfg Co*, 421 Mich 670, 692-693; 365 NW2d 176 (1984); *Granger* at 11, n 7; *Gregory v Cincinnati, Inc*, 450 Mich 1, 12; 538 NW2d 325; 47 ALR5th 877 (1995). The argument offered in this case by defense counsel well illustrates the distinction outlined in *Prentis*, where we said that "the negligence theory generally focuses on the defendant's conduct, requiring a showing that it was unreasonable, while warranty generally focuses upon the fitness of the product, irrespective of the defendant's conduct." 421 Mich 692. Sale of a defective product can breach an implied warranty, but it would not reflect negligence in the design or manufacturing process if the producer has acted reasonably at every

---

[4] The verdict forms used in the first trial and the second trial were virtually identical and the record indicates that at neither trial did Goodyear object to the general nature of the verdict form.

stage. Conversely, a negligently manufactured product would not breach an implied warranty if the nature or timing of its failure were not inconsistent with the terms of the implied warranty. [*Lagalo*, 457 Mich at 287 n 11.]

Our Supreme Court has stated that "[w]hen proceeding under a theory of implied warranty, a design defect is established by proof that the product is not reasonably safe for the uses intended, anticipated, or reasonably foreseeable." *Prentis v Yale Mfg Co*, 421 Mich 670, 692-693; 365 NW2d 176 (1984). Similarly, this Court has stated that when, as in this case, a product liability action is premised upon a breach of implied warranty of fitness, "the plaintiff must prove that a defect existed at the time the product left the defendant's control, which is normally framed in terms of whether the product was 'reasonably fit for its intended, anticipated or reasonably foreseeable use.' " *Bouverette*, 245 Mich at 396 (quotation marks and citations omitted). This approach is consistent with the traditional understanding of common law product liability, which is a form of strict liability in which a plaintiff need only prove the defective nature of the product when it left the manufacturer's hands and that the defect caused the plaintiff's injuries. See, e.g., *Ayyash v Henry Ford Health Systems*, 210 Mich App 142, 144-145; 533 NW2d 353 (1995) (noting the strict liability nature of products liability historically).

In this case, Goodyear argues that plaintiff's failure to prove a design defect potentially tainted the verdict regarding the breach of implied warranty count as well as the negligence count. However, the purpose of a special verdict is to permit courts to see what the jury has determined and to preserve the valid portions of a verdict when other portions are found to be invalid. As noted, a new trial is not necessarily warranted when one of several alternative theories of liability is found to have been improperly submitted to the jury; rather, a new trial is warranted only when "it is impossible to know if the jury rejected the other theories advanced by plaintiff and rendered judgment based on th[e] improperly submitted theory." *Tobin*, 244 Mich App at 645. Here, the verdict form specifically asked the jury regarding the breach of implied warranty count and the jury specifically found Goodyear liable on that count. We conclude that the breach of implied warranty theory in this case was a separate count properly submitted to the jury and the validity of the verdict on that count was not affected by the improper proofs on the negligence count. This is because it matters not whether the breach of implied warranty claim was premised upon design defect, manufacturing defect, or some combination of the two, as Goodyear's negligence was irrelevant to this count; the only two questions the jury needed to resolve were whether the tire was defective when it left Goodyear's control and whether such defect or defects caused plaintiff's decedent's injuries. The jury clearly answered both questions in the affirmative.

### 4. TESTIMONY REGARDING IMPACT AS A CAUSE

Goodyear next contends that Woehrle's testimony ruling out impact as a cause of the tread separation was not admissible because it is contrary to the consensus in the field and was not supported by reliable methodology. We disagree.

At trial, Woehrle testified regarding whether the tire tread separation could have been caused by an impact to the tire, such as driving through a pot hole. Woehrle opined that tread separation can never occur as the result of impact. On cross-examination, Goodyear's counsel questioned Woehrle thoroughly about publications in which other experts opine that impact can be a cause of tire tread separation. Woehrle testified consistently that although he recognized the

authoritativeness of the various publications, he disagreed with their conclusion that a tire tread separation can be caused by impact. Goodyear argues that it was error for the trial court to admit Woehrle's testimony because Woehrle's opinion was not sufficiently supported.

As stated, MRE 702 governs the admission of expert testimony and requires, essentially, that the witness' testimony (1) is based on sufficient facts or data, (2) is the product of reliable principles and methods, and that (3) the witness has applied the principles and methods reliably to the facts of the case. Any challenge to the credibility of the expert's opinion, however, such as the opposing party's disagreement with an expert's opinion or interpretation of the facts, relates to the weight of the testimony, and not its admissibility. *Surman v Surman*, 277 Mich App 287, 309; 745 NW2d 802 (2008). "Gaps or weaknesses in the witness' expertise are a fit subject for cross-examination, and go to the weight of his testimony, not its admissibility." *Wischmeyer v Schanz*, 449 Mich 469, 480; 536 NW2d 760 (1995), quoting *People v Gambrell*, 429 Mich 401, 408; 415 NW2d 202 (1987). Because the weight to be given expert testimony is for the jury to decide, *Dawe v Bar-Levav & Assoc, PC (On Remand)*, 289 Mich App 380, 401; 808 NW2d 240 (2010), the trial court in this case did not err by admitting Woehrle's testimony about impacts.

## 5. THE FIRESTONE CHART

Goodyear next contends that it is entitled to a new trial because the trial court erroneously permitted the admission of the evidence referred to by the parties as the Firestone Chart. The Firestone Chart, a one-page chart entitled "Tread Separation Rate (service condition): Recalled Tires Only" is part of a National Highway Traffic Safety Administration document, and relates to tires manufactured by Firestone (not Goodyear) that were subject to recall in 2000. The trial court permitted plaintiff to use the Firestone Chart to counter an anticipated argument by Goodyear that tire tread separations do not occur late in the life of a tire. Over Goodyear's objection, the trial court determined that the chart was admissible, but only on the issue of whether Goodyear had "notice" that tires with defects will fail later in the life of the tire. The chart, however, was irrelevant. Woehrle testified that the defect that was present in the Firestone tires, and that was the subject of the Firestone Chart, was not the same as the manufacturing defect present in the Goodyear tire in this case. The Firestone Chart therefore did not demonstrate notice to Goodyear. However, the chart was not the major focus of plaintiff's case and there was ample evidence of the manufacturing defects in the Goodyear tire to support the jury verdict on the manufacturing defect and the breach of implied warranty counts regardless of the Firestone Chart. Once again, we consider an evidentiary error as harmless unless declining to grant a new trial, or to otherwise disturb a judgment, appears inconsistent with substantial justice. Here, we conclude that any error in admitting the Firestone Chart was minimal and not a ground for disturbing the jury's verdict.

## 6. THE BEAD BARCODE

Goodyear next contends that the trial court erred in admitting evidence regarding what the parties term the "bead barcode." According to Goodyear, during the manufacture of Goodyear tires, a bead barcode is assigned to each tire and a sticker bearing the bead barcode is placed on each tire to track the tire through the various stages of manufacturing. After the tire is manufactured, the barcode is assigned to a new tire and the previous data is overwritten. During

discovery, Goodyear explained that the bead barcode that had been assigned to the tire in this case during manufacturing was soon after reassigned and any information related thereto had been overwritten long before Patel's injuries occurred.

Before the second trial, Goodyear moved to prevent plaintiff from introducing evidence of the bead barcode and from arguing "spoliation" of the information related to the bead barcode. The trial court's ruling on the motion is not entirely clear, but the trial court appears to have determined that the parties were permitted to refer to the fact that the bead barcode no longer existed but were not permitted to imply that the bead barcode information had been intentionally destroyed by Goodyear for the purpose of hiding information. Plaintiff's counsel nonetheless broached the subject of the bead barcode during trial and during closing argument, suggesting that Goodyear intentionally made the bead barcode information unavailable.

Again, evidentiary error is not ground for disturbing a judgment unless refusal to do so is inconsistent with substantial justice. MCR 2.613(A). Here, the bead barcode was not the major focus of plaintiff's case and there was ample evidence to support the jury verdict even absent the testimony regarding the bead barcode. Any error in the admission of testimony or argument regarding the bead barcode therefore was not ground for disturbing the jury's verdict.

## 7. PLAINTIFF'S COUNSEL'S REMARKS

Lastly, Goodyear argues that despite the trial court's instructions, plaintiff's counsel made improper comments throughout the trial and during closing argument that were intended to inflame the jury and to depict Goodyear as a greedy corporation attempting to cheat the helpless plaintiff. Although Goodyear objected repeatedly during the questioning of witnesses, there is no indication that Goodyear objected during plaintiff's closing argument.

Juries are routinely instructed that an attorney's arguments and remarks are not evidence to be considered by the jury. See, e.g., *Zaremba Equip, Inc v Harco Nat'l Ins Co*, 302 Mich App 7, 24-25; 837 NW2d 686 (2013). Further, "[a]n attorney's comments do not normally constitute grounds for reversal unless they reflect a deliberate attempt to deprive the opposing party of a fair and impartial proceeding." *Id*. at 21. "Reversal is required only where the prejudicial statements reveal a deliberate attempt to inflame or otherwise prejudice the jury, or to deflect the jury's attention from the issues involved." *Id*. (quotation marks and citation omitted).

In this case, although plaintiff's counsel's comments were at times inappropriate, the comments were not so inappropriate as to demonstrate a deliberate attempt to prejudice the jury, and do not go beyond the zealous advocacy seen in numerous cases. For example, during closing argument plaintiff's counsel argued that "Goodyear has the resources to hire the best attorneys and experts who have made a career out of coming into courts like this one and testifying," and "[Goodyear] wants other people to pay the price for their negligence," and "[t]he men at Goodyear refuse to listen, but you have listened, and now you give the Patels the consolation of justice." The trial court, however, instructed the jury that "[t]he lawyer's statements and arguments are not evidence. They are only meant to help you understand the evidence and each side's legal theories. . . . You should only accept things the lawyers say that are supported by the evidence or by your own common sense and general knowledge." The trial court further instructed the jury that "[t]he corporation defendant in this case is entitled to the

same fair and unprejudiced treatment as an individual would be under like circumstances, and it is your duty to decide the case with the same impartiality you would use in deciding a case between individuals." Because this Court presumes that juries follow their instructions and that the trial court's instructions to the jury cure most errors, *id*. at 25, we conclude that the remarks of plaintiff's counsel in this case do not warrant reversal.

## B. THE NON-ECONOMIC DAMAGES CAP

The jury awarded a verdict for plaintiff and against Goodyear in the amount of $16,115,048, including $8,750,000 for non-economic damages. The trial court reduced the award of $8,750,000 for non-economic damages to $794,500 in accordance with the damages cap provided in MCL 600.2946a(1). On cross-appeal, plaintiff contends that the trial court erred by not setting aside the damages cap imposed under MCL 600.2946a in light of the provisions of MCL 600.2949a. We disagree.

MCL 600.2946a provides a limit on non-economic damages in a product liability action. Whether the non-economic damages cap of MCL 600.2946a applies in a given case is a question of law that we review de novo. See *Jenkins v Patel*, 471 Mich 158, 162; 684 NW2d 346 (2004) (application of statutory damages cap in a medical malpractice context is a question of law reviewed de novo). MCL 600.2946a provides, in pertinent part:

> (1) In an action for product liability, the total amount of damages for noneconomic loss shall not exceed $280,000.00, unless the defect in the product caused either the person's death or permanent loss of a vital bodily function, in which case the total amount of damages for noneconomic loss shall not exceed $500,000.00. On the effective date of the amendatory act that added this section, the state treasurer shall adjust the limitations set forth in this subsection so that the limitations are equal to the limitations provided in section 1483 [MCL 600.1483]. . . .
>
> * * *
>
> (3) The limitation on damages under subsection (1) for death or permanent loss of a vital bodily function does not apply to a defendant if the trier of fact determines by a preponderance of the evidence that the death or loss was the result of the defendant's gross negligence, or if the court finds that the matters stated in section 2949a [MCL 600.2949a] are true.

Thus, under MCL 600.2946a(3), a plaintiff avoids the damages cap of MCL 600.2946a(1) if the defendant was grossly negligent, or if the trial court finds that "the matters stated in section 2949a are true." In this case, the jury was asked by special interrogatory whether Goodyear was grossly negligent and the jury responded "no." Plaintiff therefore cannot avoid the non-economic damages cap unless "the matters stated in section 2949a are true." MCL 600.2946a(3). MCL 600.2949a provides:

> In a product liability action, if the court determines that at the time of manufacture or distribution the defendant had actual knowledge that the product was defective and that there was a substantial likelihood that the defect would cause the injury

-13-

that is the basis of the action, and the defendant willfully disregarded that knowledge in the manufacture or distribution of the product, then sections 2946(4), 2946a, 2947(1) to (4), and 2948(2) [MCL 600.2946(4), MCL 600.2946a, MCL 600.2947(1) to (4), and MCL 600.2948(2)] do not apply.

In this case, the trial court determined that plaintiff had not established the elements of MCL 600.2949a because that statute requires "actual knowledge." The trial court reasoned that by choosing the statutory language "actual knowledge," the Legislature mandated that constructive knowledge was not sufficient. The trial court stated in its opinion:

Plaintiff ultimately cannot show that Defendant Goodyear had, in 2005 when Plaintiff's tire was manufactured, actual knowledge that the Plaintiff's tire was defective and actual knowledge of a substantial likelihood it would lead to the type of injury suffered by Plaintiff. There is no evidence from which this Court can find that Defendant Goodyear had actual knowledge of a substantial likelihood that the load range C light truck tire on Plaintiff's vehicle would suffer a tread separation. Plaintiff's own tire expert, Mr. Woehrle, testified that it was his opinion that a nylon cap ply would not prevent, only protect against, tread separations. The record supports that it was Mr. Woehrle's position that a tire without a nylon cap ply could be safe. It was the other conditions he found to exist in this tire, the manufacturing defects concerning which Plaintiff cannot establish Defendant Goodyear had actual knowledge as indicated above, that in his opinion caused the tire to fail without the nylon cap ply.

Plaintiff contends that the trial court erred in this determination by considering only the specific tire in this case and not the entire product line produced by Goodyear. Plaintiff argues that Goodyear knew that a tire with a manufacturing defect could cause an accident in which a person could experience serious injury, and that Goodyear nonetheless failed to properly inspect, which Goodyear knew eventually would result in defective tires entering the stream of commerce. Plaintiff thus urges this Court to read the statutory language that imposes liability if Goodyear "had actual knowledge that the product was defective" to impose liability if Goodyear "should have known that there could be a defective product in the product line." We decline to so read the statute. MCL 600.2949a does not specify whether the term "the product" refers to a specific unit or the entire product line. We agree with the trial court, however, that "actual knowledge" is not the same as constructive knowledge or imputed knowledge. The trial court therefore did not err in concluding that plaintiff did not establish the criteria required by MCL 600.2949a for setting aside the noneconomic damages cap.

Affirmed.

/s/ David H. Sawyer
/s/ Cynthia Diane Stephens
/s/ Michael F. Gadola